## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| ESTECH SYSTEMS, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Case No. 2:20-cv-00123-JRG-RSP |
| TARGET CORPORATION, | § | (LEAD CASE) |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |
| | § | |
| PLAINSCAPITAL BANK, | § | Case No. 2:20-cv-00122-JRG-RSP |
| | § | (MEMBER CASE) |
| *Defendant.* | § | |
| | § | |
| | § | |
| BOKF, NATIONAL ASSOCIATION, | § | Case No. 2:20-cv-00126-JRG-RSP |
| | § | (MEMBER CASE) |
| *Defendant.* | § | |
| | § | |
| | § | |
| WELLS FARGO & COMPANY and | § | Case No. 2:20-cv-00128-JRG-RSP |
| WELLS FARGO BANK, N.A., | § | (MEMBER CASE) |
| | § | |
| *Defendants.* | § | |
| | § | |
| | § | |
| BBVA USA, | § | Case No. 2:20-cv-00127-JRG-RSP |
| | § | (MEMBER CASE) |
| *Defendant.* | § | |
| | § | |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

1

Before the Court is the opening claim construction brief of Estech Systems, Inc. ("Plaintiff"), filed on January 21, 2021. Dkt. No. 126.[1] On February 4, 2021, Target Corporation, PlainsCapital Bank, BOKF, National Association, BBVA USA, Wells Fargo & Company, and Wells Fargo Bank, N.A. (collectively the "Defendants") filed their response. Dkt. No. 133. On February 10, 2021, Plaintiff filed its reply. Dkt. No. 135. On March 4, 2021, the Court held a hearing on the issues of claim construction and claim definiteness. Having considered the arguments and evidence presented by the parties at the hearing and in their briefing, the Court issues this Order.

---

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

**Table of Contents**

I.     BACKGROUND ................................................................................. 5

    A.    U.S. Patent No. 6,067,349 ....................................................... 5

    B.    U.S. Patents No. 7,068,684, No. 7,123,699, and No. 8,391,298 .......................... 6

II.    LEGAL PRINCIPLES ....................................................................... 8

    A.    Claim Construction ................................................................... 8

    B.    Departing from the Ordinary Meaning of a Claim Term ...................................... 11

    C.    Functional Claiming and 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA) ......... 12

III.    AGREED CONSTRUCTIONS ......................................................... 14

IV.    CONSTRUCTION OF DISPUTED TERMS .................................... 15

    A.    U.S. Patent No. 6,067,349 ..................................................... 15

        A-1.    "wherein the caller ID information is stored in association with a voice message" ................................................ 15

        A-2.    "automatically dialing the telephone number at a request of the called party while the called party is listening to the voice message" ...................................................... 17

    B.    U.S. Patent No. 7,068,684 ..................................................... 20

        B-1.    "a data server coupled to the hub" ............................... 20

        B-2.    "sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step" ................................ 22

        B-3.    "reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold" ................................................ 24

    C.    U.S. Patent No. 7,123,699 ..................................................... 26

        C-1.    "coupling a second LAN to the first LAN over a WAN" ........................ 26

        C-2.    "coupling an audio path over the channel between the telecommunications device and the voice mail box" ............................... 28

        C-3.    "in response to an input at the telecommunications device, sending a user mail box connection message from the second LAN to the first LAN requesting a channel" .................................. 30

        C-4.    "direct station select input" ....................................... 32

    D.    U.S. Patent No. 8,391,298 ..................................................... 35

        D-1.    "a first local area network ('LAN')," "a second LAN," "a wide area network ('WAN')," and "a third LAN" .......................... 35

        D-2.    "wherein the list of the plurality of telecommunications extensions is stored in a server in the second LAN, and is accessed by the first circuitry across the WAN" ........................................ 37

D-3.   "select between observing the list of the plurality of telecommunications extensions coupled to the second LAN or observing a list of the plurality of telecommunications extensions coupled to the third LAN" ........................................................................ 40

D-4.   "circuitry for automatically calling …" ..................................................... 43

**V.**     **CONCLUSION** ........................................................................................... **47**

# I.    BACKGROUND

Plaintiff alleges infringement of four U.S. Patents: No. 6,067,349 (the "'349 Patent"), No. 7,068,684 (the "'684 Patent"), No. 7,123,699 (the "'699 Patent"), and No. 8,391,298 (the "'298 Patent") (collectively, the "Asserted Patents").

## A.    U.S. Patent No. 6,067,349

In general, the '349 Patent is directed to technology for using caller ID for dialing out and creating calling (speed-dial) lists.

The '349 Patent issued from an application filed on December 31, 1997. The abstract of the '349 Patent provides:

> A telephone and voice mail (voice processing) system, which is implemented using only a single processing system for controlling operation of both the telephone system and the voice mail system, permits a user to call back a party using caller ID data stored with a voice mail message left by the party calling into the system. This is accomplished by storing caller ID information associated with an incoming call along with the message placed by the incoming caller and stored within the mailbox associated with the called party. Additionally, the caller ID information may be used to create a speed dial list within the telephone and voice mail system for later use by the user. Such caller ID information may be retrieved from a voice mail message left by the calling party, or may be retrieved while conducting a conversation with the incoming call.

'349 Patent *Abstract*. Claim 1 of the '349 Patent, an exemplary asserted claim, provides as follows:

> A method comprising the steps of:
> receiving an incoming call from a calling party over a switched telephone network, wherein the incoming call includes caller ID information, wherein the caller ID information includes a telephone number of the calling party;
> connecting the incoming call to a voice mailbox;
> storing the caller ID information in association with the voice mailbox, wherein the voice mailbox is associated with a called party, and ***wherein the caller ID information is stored in association with a voice message*** left by the calling party for the called party in the voice mailbox; and
> ***automatically dialing the telephone number at a request of the called party while the called party is listening to the voice message***.

'349 Patent col.11 ll.29–44 (emphasis added).

### B.      U.S. Patents No. 7,068,684, No. 7,123,699, and No. 8,391,298

The '684, '699, and '298 Patents are each generally directed to technology for improving Voice over IP systems. The '684 Patent is generally directed to technology for improved bandwidth sharing between data and IP telephony systems on a network. The '699 Patent is generally directed to technology for improving voice mail in an IP telephony system. The '298 Patent is generally directed to technology for improving phone-number directories in an IP telephony system.

These patents are related through priority claims. Each patent lists a priority claim to the application that issued as the '684 Patent, which was filed on February 1, 2001. The '699 Patent issued from an application that is a continuation-in-part of the '684 Patent's application. Similarly, the '298 Patent issued from an application that is a continuation-in-part of the '684 Patent's application.

The abstract of the '684 Patent provides:

> An information handling system comprises a TCP/IP network connecting a hub to a multimedia server and the hub to a data server, and the hub to an IP telephony device that is then coupled to a network device. Data sent from the network device is addressed for transmission to the data server and is transmitted through the IP telephony device to the TCP/IP network. The IP telephony device monitors when an amount of data being received over the network falls below a predetermined threshold. If this occurs, the IP telephony device will send a signal to the multimedia server, which will then generate a congestion signal to send to all or selected IP telephony devices in the network to throttle data being received by the IP telephony devices from their respective connected network devices.

'684 Patent *Abstract*.

The abstract of the '699 Patent provides:

> In a voice over IP system, an IP telephone includes an LED lamp that indicates a voice message has been stored in a remote voice mail system. The IP telephone can then access that voice message. The message can also be moved from one remote site to another.

'699 Patent *Abstract*.

6

The abstract of the '298 Patent provides:

> In a Voice over IP system, a user can dial numbers stored in a series of lists, which are stored in the system and displayed to the user of an IP telephone. One implementation will allow a user to scroll through a list of remote sites. When the user finds the desired site, the user is then presented with the same options as a user local to that site. All of this can be performed without the need for an operator or a printed directory. This system provides an ability for a user to scroll through a list of names and phone numbers and then call a person once their name and phone number is displayed.

'298 Patent *Abstract*.

Claim 29 of the '684 Patent, Claim 1 of the '699 Patent, and Claim 1 of the '298 Patent are

exemplary asserted claims. They recite:

> In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and ***a data server coupled to the hub***, a method comprising the steps of:
>> transferring data from the workstation to the telephone, wherein the data sent from the workstation is addressed for transmission to the data server;
>> communicating audio information between the telephone and the multimedia server; and
>> ***sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step***, wherein the throttling step further comprises the step of monitoring an amount of the audio information being received by the telephone from the multimedia server.

'684 Patent col.19 ll.4–29 (emphasis added);

> In a telecommunications system, a method comprising the steps of:
>> storing a voice mail message in a voice mail box in a voice mail system within a first LAN;
>> ***coupling a second LAN to the first LAN over a WAN***, wherein the first LAN, the second LAN, and the WAN operate under a mutable network protocol;
>> providing a sensory indication on a telecommunications device within the second LAN that the voice message is stored in the voice mail box within the first LAN; and
>> the telecommunications device accessing the voice mail system within the first LAN to listen to the voice message stored in the voice mail box,
>> wherein the step of the telecommunications device accessing the voice mail system within the first LAN to listen to the voice message stored in the voice mail box further comprises the steps of:

establishing a channel between the first and second LANs over the WAN;

*coupling an audio path over the channel between the telecommunications device and the voice mail box*; and

streaming voice data containing the voice message from the voice mail box to the telecommunications device over the audio path, wherein the establishing step further comprises the steps of:

*in response to an input at the telecommunications device, sending a user mail box connection message from the second LAN to the first LAN requesting a channel*, wherein the user mail box connection message includes an extension associated with the telecommunications device and an identification of the voice mail box;

assigning the channel by the first LAN; and

sending a connection established message from the first LAN to the second LAN.

'699 Patent col.12 l.53 – col. 13 l.21 (emphasis added); and

An information handling system comprising:

*a first local area network ("LAN")*;

*a second LAN*;

*a wide area network ("WAN")* coupling the first LAN to the second LAN;

*a third LAN* coupled to the first and second LANs via the WAN;

a first telecommunications device coupled to the first LAN;

a plurality of telecommunications extensions coupled to the second LAN;

the first LAN including first circuitry for enabling a user of the first telecommunications device to observe a list of the plurality of telecommunications extensions;

the first LAN including *second circuitry for automatically calling one of the plurality of telecommunications extensions in response to the user selecting one of the plurality of telecommunications extensions from the observed list*, *wherein the list of the plurality of telecommunications extensions is stored in a server in the second LAN, and is accessed by the first circuitry across the WAN*; and

a plurality of telecommunications extensions coupled to the third LAN, the first LAN including circuitry for enabling the user to *select between observing the list of the plurality of telecommunications extensions coupled to the second LAN or observing a list of the plurality of telecommunications extensions coupled to the third LAN*.

'298 Patent col. 15 l.58 – col. 16 l.19.

## II.    LEGAL PRINCIPLES

### A.    Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

8

(Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Phillips*, 415 F.3d at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Id*. at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry … begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Markman*, 52 F.3d at 979 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Id*. at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *See id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *See id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

### B.    Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the

specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C.    Functional Claiming and 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA)

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112, ¶ 6; *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

relevant portion). Section 112, Paragraph 6, provides that a structure may be claimed as a "means … for performing a specified function" and that an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002).

But § 112, ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112, ¶ 6 applies when the claim language includes "means" or "step for" terms, and that it does not apply in the absence of those terms. *See Masco Corp.*, 303 F.3d at 1326; *Williamson*, 792 F.3d at 1348. The presumption stands or falls according to whether one of ordinary skill in the art would understand the claim with the functional language, in the context of the entire specification, to denote sufficiently definite structure or acts for performing the function. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (§ 112, ¶ 6 does not apply when "the claim language, read in light of the specification, recites sufficiently definite structure" (quotations omitted) (citing *Williamson*, 792 F.3d at 1349; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014))); *Williamson*, 792 F.3d at 1349 (§ 112, ¶ 6 does not apply when "the words of the claim are understood by persons of ordinary skill in the art to have sufficiently definite meaning as the name for structure"); *Masco Corp.*, 303 F.3d at 1326 (§ 112, ¶ 6 does not apply when the claim includes an "act" corresponding to "how the function is performed"); *Personalized Media Communications, L.L.C. v. International Trade Commission*, 161 F.3d 696, 704 (Fed. Cir. 1998) (§ 112, ¶ 6 does not apply when the claim includes "sufficient structure, material, or acts within the claim itself to perform entirely the recited function … even if the claim uses the term 'means.'" (quotation marks and citation omitted)).

When it applies, § 112, ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347. Construing a means-plus-function limitation

involves multiple steps. "The first step … is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "[T]he next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Medtronic, Inc.*, 248 F.3d at 1311. A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* The focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.* The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). However, § 112 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

For § 112, ¶ 6 limitations implemented by a programmed general-purpose computer or microprocessor, the corresponding structure described in the patent specification must include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). The corresponding structure is not a general-purpose computer but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

## III.   AGREED CONSTRUCTIONS

The parties have agreed to constructions set forth in their Joint Claim Construction Chart Pursuant to Rule 4-5(d). Dkt. No. 140. Based on the parties' agreement, the Court hereby adopts the agreed constructions.

## IV.   CONSTRUCTION OF DISPUTED TERMS

### A.   U.S. Patent No. 6,067,349

#### A-1.   "wherein the caller ID information is stored in association with a voice message"

| Disputed Term[3] | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "wherein the caller ID information is stored in association with a voice message"  <br><br>• '349 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | the voice message file and the caller ID information are stored on the same hard disk |

**The Parties' Positions**

Plaintiff submits: The meaning of this term is plain without construction, and it is not what Defendants propose. For example, storing the caller ID in association with a voice message is not coextensive with storing the caller ID and voice message on the same hard disk. In fact, the claim does not require storing the voice message at all. And the '349 Patent describes that the caller ID may be stored on memory other than a hard disk (citing '349 Patent col.8 ll.6–9). Dkt. No. 126 at 32–33.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '349 Patent col.8 ll.6–9.

Defendants respond: As described in the '349 Patent, the caller ID information and the voice mail message are stored together on a hard disk. "Further, the only description of how the stored caller ID information and the stored message are 'connected' or in any way related is by indexing them and storing them with a data structure on hard disk 107." "There is simply no other way

---

[3] For all term charts in this order, the claims in which the term is found are listed with the term but: (1) only the highest-level claim in each dependency chain is listed, and (2) only asserted claims identified in the parties' Joint Claim Construction Chart Pursuant to Rule 4-5(d) (Dkt. No. 140) are listed.

described of storing the caller ID information and stored message." Notably, the patent does not describe storing called ID information in one memory and the voice message in a different memory, it "provides no enablement for such an idea." And while the patent describes that the caller ID may be stored in some other memory means, "it does not provide any information as to what these 'other memory means' are or how the system would store this caller ID information in a first memory 'in association' with voice message information stored in another location." Dkt. No. 133 at 11–13.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '349 Patent col.2 ll.53–55, col.2 ll.59–64, col.3 ll.44–47, col.8 ll.6–9, col.8 ll.16–17, col.8 ll.32–35, col.8 ll.46–47, col.9 ll.6–15, col.9 ll.22–24, col.9 ll.36–40.

Plaintiff replies: "Defendants are conflating claim construction with enablement/written description." Dkt. No. 135 at 7–8.

### Analysis

There appear to be two issues in dispute. First, whether the claim language requires storing the voice message. It does not, though the voice message is inherently stored. Second, whether the claim language requires that the caller ID information and the voice message be stored on the same hard disk. It does not.

The voice message of the claim is inherently stored, though the claim does not affirmatively require "storing" the voice message. Claim 1 provides significant guidance on this point:

> A method comprising the steps of:
> receiving an incoming call from a calling party over a switched telephone network, wherein the incoming call includes caller ID information, wherein the caller ID information includes a telephone number of the calling party;
> connecting the incoming call to a voice mailbox;
> ***storing the caller ID information in association with the voice mailbox***, wherein the voice mailbox is associated with a called party, and ***<u>wherein the caller</u>***

> **_ID information is stored in association with a voice message_** left by the
> **_calling party for the called party in the voice mailbox_**; and
> automatically dialing the telephone number at a request of the called party while
> the called party is listening to the voice message.

'349 Patent col.11 ll.29–44 (emphasis added). Notably, the voice message is "left … in the voice mailbox."

The caller ID and voice message are not necessarily stored on the same hard disk. Indeed, the '349 Patent expressly provides an embodiment in which the caller ID information is stored in memory other than the hard drive on which the voice message is stored. For instance, the patent describes an embodiment in which "[h]ard disk 107 stores … voice mail messages" and "caller ID information … [is sent] for storage within hard disk 107 **_or some other memory means_**." '349 Patent col.2 ll.54–55, col.8 ll.6–9 (emphasis added). In other words, the patent teaches away from the limitation advocated by Defendants. Whether the patent enables or adequately describes the other-memory-means embodiment is not an issue of claim construction.

Accordingly, the Court rejects Defendants' proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

### A-2.   "automatically dialing the telephone number at a request of the called party while the called party is listening to the voice message"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "automatically dialing the telephone number at a request of the called party while the called party is listening to the voice message"<br><br>• '349 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | while a voice message is audibly played to the called party, initiating a connection request for a call from the called party to the calling party without the called party dialing any digit of the telephone number of the calling party |

**The Parties' Positions**

Plaintiff submits: The meaning of this term is plain without construction, and it is not what Defendants propose. For example, nothing in the '349 Patent precludes a called party from selecting a number that happens to be in a telephone number to request the automatic dialing of the telephone number. The other changes to the claim language that Defendants propose are similarly unsupported. Dkt. No. 126 at 34–35.

Defendants respond: As described in the '349 Patent a user listening to a voicemail message may request automatic dialing of the phone number that left the message by pressing a "redial key" to initiate the dialing task. The "redial key" "is not a digit of the phone number." Plaintiff "has not identified any other embodiments beyond the repeated description of this action." And this term should be construed to "ensure the claims of the '349 Patent are afforded their scope as evidenced by what the applicant had in its possession as of the filing of the '349 Patent." Dkt. No. 133 at 13–14.

In addition to the claims themselves, Defendants cite the following intrinsic evidence to support their position: '349 Patent col.8 ll.43–49, col.9 ll.8–11, col.9 ll.29–35; Dkt. No. 133-5 at 110–15, 114; Dkt. No. 133-5 at 118–26, 119; Dkt. No. 133-5 at 127–29.

Plaintiff replies: Defendants' improperly present an "enablement/written description argument" as a claim-construction argument. Dkt. No. 135 at 9–10.

**Analysis**

The issue in dispute appears to distill to whether the "request" in the phrase "automatically dialing the telephone number at a request of the called party" necessarily excludes selecting a digit of the telephone number. It does not.

Defendants' negative limitation is not supported by the record. Defendants rely on the following description of an embodiment in which a redial key is used to initiate the automatic dialing:

> Referring next to FIGS. 10A and 10B, there is illustrated a process for re-dialing using the caller ID information stored in the manner illustrated above with respect to FIG. 9. In step 1001, a user at an extension is listening to the voice mail message left to them by an outside call (see step 908). In step 1002, if the user has not pressed a redial key 1410, then the user continues to listen to the voice mail message until the voice mail message ends in step 1003. However, ***if the user presses the redial key 1410 while listening to the voice mail message, then the process proceeds to step 1004 whereby the caller ID data stored along with the message within the mailbox message structure is retrieved to speed dial data structures in DRAM 112, which are then supplied to the dialing task***.

'349 Patent col.8 ll.36–49 (emphasis added). This does not establish that the use of the redial key, or any particular key to initiate the dialing task, is an important or inherent feature of the invention. Indeed, the patent suggests the opposite, that the use of the redial key (or any particular key) is merely exemplary:

> The process described above with respect to FIGS. 9 and 10A-10B ***enables a user at a telephone extension coupled to system 100 to merely press one key, such as a redial button, on their telephone while listening to a voice mail message in order to make an outgoing telephone call*** to the calling party who left the voice mail message. This is accomplished by storing the caller ID information retrieved from the incoming call along with the voice mail message so that the present invention may retrieve that caller ID information if such a redial procedure is enabled by the user.

*Id.* at col.9 ll.6–15 (emphasis added). Ultimately, the context provided by the patent does not support Defendants' proposed negative limitation. Again, whether the patent enables or adequately describes using a digit of the telephone number to request the automatic dialing of the number is not an issue of claim construction.

Accordingly, the Court rejects Defendants' proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

B.     **U.S. Patent No. 7,068,684**

B-1.   **"a data server coupled to the hub"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "a data server coupled to the hub"<br><br>• '684 Patent Claims 29, 36, 37 | Plain and ordinary meaning; no construction necessary. | a data server wired to the hub<br><br>alternatively,<br>• a data server connected to the hub where the connection is a wired connection. |

**The Parties' Positions**

Plaintiff submits: The term "coupled" is used according to its customary meaning, which is not limited to a wired connection. And the description of embodiments of the invention do not support narrowing the meaning of "coupled" to a wired connection. Notably, while the '684 Patent describes using Ethernet as a data transfer protocol, Ethernet is expressly an exemplary protocol and is not limited to a wired connection in any event. Dkt. No. 126 at 10–13.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '349 Patent col.3 l.67 – col.4 l.1.

Defendants respond: "The '684 Patent consistently, and exclusively, uses the word 'coupled' to describe a wired connection." Further, in the relevant time period, "coupling" meant a wired connection because "wireless connections were not contemplated for the connections in the described systems." Thus, the Court should "limit the scope of the claims of the '684 Patent to what was actually in the Applicants' possession in 2001." Dkt. No. 133 at 14–16.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '684 Patent col.4 ll.6–12, col.5 ll.23–25, col.5 ll.36–42, col.10 ll.40–43. col.11 ll.2–4, col.11 ll.65–67.

## Analysis

The issue in dispute is whether the coupling of the data server to the hub necessarily excludes all coupling other than a wired connection. It does not.

The "coupled" of the claims refers to a communicative connection but not necessarily a wired connection. For instance, Claim 29 provides:

> In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub, a method comprising the steps of:
> transferring data from the workstation to the telephone, wherein the data sent from the workstation is addressed for transmission to the data server;
> communicating audio information between the telephone and the multimedia server; and
> sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the throttling step further comprises the step of monitoring an amount of the audio information being received by the telephone from the multimedia server.

'684 Patent col.19 ll.4–19. The claim is plainly directed to various devices (e.g., servers, hub, telephone, workstation) that are connected to enable communication. Nothing in the claims or the description of the embodiments mandates that the communicative connection is limited to a wired connection.

Defendants' argument is in large part premised on a fact that Defendant failed to establish. Namely, that wireless connections were not contemplated in the art in 2001 for server-hub coupling. But even if that is true, "[t]he law ***does not require that an applicant describe*** in his specification every conceivable and possible ***future embodiment*** of his invention." *SuperGuide Corp. v. DirecTV Enters.*, 358 F.3d 870, 878–81 (Fed. Cir. 2004) (emphasis added). Indeed, Federal Circuit "case law allows for after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1371 (Fed. Cir. 2008).

Accordingly, the Court construes this term as follows:

- "a data server coupled to the hub" means "a data server communicatively connected to the hub."

### B-2. "sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step"<br><br>• '684 Patent Claims 29, 36, 37 | Plain and ordinary meaning; no construction necessary. | reducing the number of data packets sent from the workstation to the telephone to comply with a predetermined quality of service level of audio allowing for no discernable audio decrease in quality |

### The Parties' Positions

Plaintiff submits: The meaning of this term is plain without construction. It is not limited to reducing the "number of data packets," or complying "with a predetermined quality of service level of audio," or "allowing for no discernable audio decrease in quality." The description of embodiments of the invention does not support limiting this term as Defendants suggest. In fact, the '684 Patent describes throttling of "data" rather than "data packets" and allowing a decrease in audio quality rather than precluding it. Dkt. No. 126 at 13–15.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '684 Patent col.12 ll.36–45.

Defendants respond: The only guide to the sufficiency of throttling provided in the '684 Patent is "the use of Quality of Service ('QoS')-based throttling." And "[g]iven the patent's use of the term *amount*, it is clear that what is contemplated by throttling, in part, is the *number* of data

packets (e.g., a level)" (Defendants' emphasis). In fact, the patent describes that the throttling is triggered by a threshold number of data packets. Dkt. No. 133 at 16–18.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '684 Patent *Abstract*, col.1 ll.56–58, col.4 ll.43–46, col.12 l.13, col.12 ll.36–45, col.13 ll.17–49, col.13 l.54 – col.14 l.12, col.14 ll.41–46; Dkt. No. 133-6 at 304–24, 322.

<u>**Analysis**</u>

There appear to be two issues in dispute. First, whether "throttling the data" necessarily entails "reducing the number of data packets." It does not. Second, whether "sufficiently" throttling the data "to increase a rate of transfer of the audio information" necessarily entails "comply[ing] with a predetermined quality of service level of audio allowing for no discernable audio decrease in quality." It does not.

The claim language is not limited as the Defendants suggest. The plain meaning of the term at issue is broader than the described embodiments the Defendants' cite to limit the meaning of the claims. For example, "sufficiently throttling data … to increase a rate of transfer" of audio information plainly states that the throttling is sufficient if it increases a rate of transfer of audio information, regardless of whether the increase in the rate of transfer is sufficient to satisfy some unrecited quality of service level. While the '684 Patent may describe throttling that is sufficient to satisfy a quality of service level, the Defendants have not identified any description that rises to the exacting standard to limit the broad plain meaning of the claim language to require compliance with a quality of service level. Similarly, "throttling data" is broader than "reducing a number of data packets" and the Defendants have not identified anything that rises to the exacting standard to so limit it. Notably, the Defendants have not established that an amount of data is limited to a number of data packets. Ultimately, the patent teaches that "[t]he throttling can be performed using

23

many different methods" rather than being limited as the Defendants suggest. '684 Patent col.13 ll.50–51.

Accordingly, the Court rejects the Defendants' proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

### B-3.   "reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold"<br><br>• '684 Patent Claim 36 | Plain and ordinary meaning; no construction necessary. | reducing the number of data packets to be transferred from the workstation when a predetermined level of data is exceeded |

### The Parties' Positions

Plaintiff submits: The meaning of this term is plain without construction. Defendants' proposed construction improperly changes the scope of this term by eliminating the "future" limitation, changing "amount of data" to "number of data packets," and by changing "threshold" to "level of data." With respect to "threshold," while the patent uses the phrase "threshold, or level," it does so in the context of describing when the number of packets in a buffer "falls below a predetermined threshold" rather than "when the amount of data exceeds a predetermined threshold." Dkt. No. 126 at 15–17 (emphasis omitted).

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '684 Patent col.12 ll.11–19.

Defendants respond: As described in the '684 Patent, throttling is triggered by congestion which is determined based on whether the number of packets in a buffer reaches a "predetermined number of packets (e.g., a level of data)." Thus, reducing the number of data packets to be

24

transferred is triggered when the amount of data exceeds a predetermined level of data. Dkt. No. 133 at 18–19.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '684 Patent col.12 ll.11–19, col.12 l.46 – col.15 l.13.

<u>**Analysis**</u>

The dispute distills to two issues. First, whether "reducing a future amount of data" necessarily entails "reducing the number of data packets." It does not. Second, whether a "predetermined threshold" refers to a level of data. It does.

For the reasons set forth in the section on "sufficiently throttle," the Court declines to limit throttling or reducing data to reducing the number of data packets.

"Threshold" in the term plainly refers to a level of data. To begin, the "amount of data" in the claim is compared to the threshold to determine whether to reduce the future amount of data. This alone suggests that the threshold represents an amount of data. And while the '684 Patent may not describe an embodiment in which throttling is triggered by an amount of data exceeding a threshold, it does describe an embodiment in which throttling is triggered when an amount of data "falls below the predetermined threshold, or level." '684 Patent col.12 ll.11–19. Again, this indicates that the threshold against which the amount of data is compared is a level of data.

Accordingly, the Court construes this term as follows:

- "reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold" means "reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined level of data."

### C.    U.S. Patent No. 7,123,699

### C-1.    "coupling a second LAN to the first LAN over a WAN"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "coupling a second LAN to the first LAN over a WAN"<br><br>• '699 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | creating a dedicated connection between a second LAN and the first LAN via a WAN |

**The Parties' Positions**

Plaintiff submits: The term "coupling" is used according to its customary meaning, which is the same in the '699 Patent as it is in the related '684 Patent. Defendants' proposed "dedicated connection" limitation is not supported by the evidence. Rather, the '699 Patent explains that dedicated circuits between facilities are not required, and in fact may be eliminated by the invention. Dkt. No. 126 at 17–19 (citing '699 Patent col.1 ll.10–12, col.1 ll.37–41).

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '699 Patent col.1 ll.10–12, col.1 ll.37–41.

Defendants respond: "Throughout the specification, the term 'coupling' or 'coupled' is used to mean the act of creating a dedicated, wired connection between specific components." The dedicated connection "serves the purpose of streaming voice mail data," it "is used specifically for accessing voice mail messages." And when its purpose is served, "the connection is torn down." That it is torn down once its purpose is served indicates that the connection is dedicated to the purpose. Dkt. No. 133 at 20–21.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '699 Patent col.2 ll.60–61, col.9 ll.23–24, col.10 l.66 – col.11 l.4, col.11 ll.31–35, col.11 ll.55–63.

**Analysis**

The issue in dispute distills to whether "coupling" in this term is limited to creating a dedicated connection. It is not.

Defendants have not identified anything that rises to the exacting standard to take the plain meaning of "coupling" two LANs and limit it to require a "dedicated" connection between the LANs. Indeed, the '699 Patent teaches that Voice over IP technology "can eliminate the need for expensive, dedicated circuits between facilities." '699 Patent col.1 ll.35–41. And the patent's description of tearing down a connection that Defendants suggest indicates a dedicated connection between the LANs refers to only one of at least two communication routes between the coupled LANs. For example, with reference to Figure 11, the patent describes: (1) sending a message between two LANs over a WAN to indicate the presence of a voicemail message, *id.* at col.10 ll.43–50 (item 1101); (2) sending a connection request between the LANs in response to this message, *id.* at col.10 l.66 – col.11 l.4; (3) establishing a voice channel between the LANs in response to this connection request, *id.* at col.11 ll.19–35, and (4) tearing down the voice channel, *id.* at col.11 ll.55–63. Even if tearing down the voice channel indicates that the voice channel is dedicated (which the Court does not hold), it does not indicate that all communication routes between the coupled LANs are dedicated in that not all are torn down. Thus, this description does not indicate that coupling two LANs is necessarily through a dedicated connection.

Accordingly, the Court construes this term as follows:

- "coupling a second LAN to the first LAN over a WAN" means "communicatively connecting a second LAN to the first LAN over a WAN."

### C-2.   "coupling an audio path over the channel between the telecommunications device and the voice mail box"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "coupling an audio path over the channel between the telecommunications device and the voice mail box"<br><br>• '699 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | creating a dedicated electrical connection for the flow of audio information between the telecommunications device and the voice mail box |

### The Parties' Positions

Plaintiff submits: The meaning of this term is plain without construction. "Coupling" has its customary meaning, just as in the "… coupled to the hub" and the "coupling a second LAN …" limitations. Coupling an audio path over a channel does not require a dedicated electrical connection. Further, the claim recites streaming voice data, not "audio information," over the audio path. Dkt. No. 126 at 19–20.

In addition to the claims themselves, Plaintiff cites the following **extrinsic evidence** to support its position: Dkt. No. 126-7 at 6.

Defendants respond: For the reasons set forth for the "coupling a second LAN …" limitation, "coupling an audio path" requires creating a dedicated connection. Further, the audio path is coupled over a "channel." "As used in the context of communications, the channel serves to carry or transfer information." Thus, the channel of the audio path is "an electrical connection used for the flow of audio information." Dkt. No. 133 at 21–23.

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '699 Patent col.11 ll.11–16, col.11 ll.31–33, col.11 ll.55–63. **Extrinsic evidence**: Dkt. No. 133-9 at 5.

28

**Analysis**

There appear to be three issues in dispute. First, whether the "coupling" requires creating a dedicated connection. It does not. Second, whether the coupling is necessarily "electrical." It is not. Third, whether the channel is necessarily for transferring audio information. It is, in the sense that audio path coupled over the channel is necessarily capable of transferring audio information.

The "coupling" at issue is not limited to creating a dedicated electrical connection. For the reasons set forth in the section on "coupling a second LAN …," the Court rejects that coupling is limited to a dedicated connection. And the Court rejects that "coupling" is limited to an electrical connection as the Defendants offer no sufficient reason for this limitation.

The audio path that is coupled over the channel is for transferring audio information. This is plain from the surrounding claim language. For instance, the claim recites "streaming voice data containing the voice message from the voice mail box to the telecommunications device over the audio path." '699 Patent col.13 ll.8–10. The Court understands that "voice data" is audio information. Thus, the audio path must be capable of transferring audio information.

Accordingly, the Court construes this term as follows:

- "coupling an audio path over the channel between the telecommunications device and the voice mail box" means "communicatively connecting a path capable of transferring audio information such as voice data over the channel between the telecommunications device and the voice mail box."

**C-3.** **"in response to an input at the telecommunications device, sending a user mail box connection message from the second LAN to the first LAN requesting a channel"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "in response to an input at the telecommunications device, sending a user mail box connection message from the second LAN to the first LAN requesting a channel"<br><br>• '699 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | requesting a dedicated electrical connection between the first LAN and second LAN for the transfer of real-time audio data in response to an input at the telecommunications device |

**The Parties' Positions**

Plaintiff submits: The meaning of this term is plain without construction. As with the "channel" of the "coupling an audio path … over the channel …" limitation, the "channel" here is not limited to a "dedicated electrical connection." Further, the claim recites streaming voice data, without mention of the "real-time audio" limitation Defendants propose. Dkt. No. 126 at 21–22.

Defendants respond: For the reasons set forth for "coupling an audio path over the channel," the channel is a dedicated electrical connection. And as described in the '699 Patent, the audio information is transferred over the channel in real time. Dkt. No. 133 at 23–24.

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '699 Patent col.10 ll.16–17, col.11 ll.31–35, col.11 ll.55–63, col.11 l.66 – col.12 l.9. **Extrinsic evidence**: Dkt. No. 133-9 at 5.

**Analysis**

There are two issue in dispute. First, whether the channel is limited to "a dedicated electrical connection." It is not. Second, whether the channel is necessarily for "transfer of real-time audio data." It is not.

The "channel" at issue is the same "channel" of the "coupling an audio …" limitation and the Court reiterates its reasoning set forth in that section. Claim 1 of the '699 Patent provides as follows:

> In a telecommunications system, a method comprising the steps of:
> storing a voice mail message in a voice mail box in a voice mail system within a first LAN;
> coupling a second LAN to the first LAN over a WAN, wherein the first LAN, the second LAN, and the WAN operate under a mutable network protocol;
> providing a sensory indication on a telecommunications device within the second LAN that the voice message is stored in the voice mail box within the first LAN; and
> the telecommunications device accessing the voice mail system within the first LAN to listen to the voice message stored in the voice mail box,
> wherein the step of the telecommunications device accessing the voice mail system within the first LAN to listen to the voice message stored in the voice mail box further comprises the steps of:
> ***establishing a channel*** between the first and second LANs over the WAN;
> coupling an audio path ***over the channel*** between the telecommunications device and the voice mail box; and
> streaming voice data containing the voice message from the voice mail box to the telecommunications device over the audio path, ***wherein the establishing step*** further comprises the steps of:
> ***in response to an input at the telecommunications device, sending a user mail box connection message from the second LAN to the first LAN requesting a channel***, wherein the user mail box connection message includes an extension associated with the telecommunications device and an identification of the voice mail box;
> assigning the channel by the first LAN; and
> sending a connection established message from the first LAN to the second LAN.

'699 Patent col.12 l.53 – col.13 l.21 (emphasis added). The claim requires "establishing a channel" and further requires that this establishing includes a number of steps, including sending a message "requesting a channel" "in response to an input." From this, the Court understands the term at issue relates to establishing the channel over which the audio path is coupled. Thus, as stated above in the section on the "coupling and audio path over the channel …" limitation, neither "coupling" nor "channel" are limited to a "dedicated electrical connection" and the audio path coupled over the channel is necessarily capable of transferring audio information. The Court further rejects

31

Defendants' proposed real-time limitation. Defendants' have failed to identify anything that rises to the exacting standard required to effectively rewrite "audio" as "real-time audio."

Accordingly, the Court rejects Defendants' proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

### C-4.   "direct station select input"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "direct station select input"<br><br>• '699 Patent Claim 2 | Plain and ordinary meaning; no construction necessary. | an input from a DSS console having LED lamps and programmable function keys to monitor the status of individual stations, trunks or features |

**The Parties' Positions**

Plaintiff submits: As is well known in the art, a "'direct station select input' is simply an input that allows access to an associated function." In the claim, this input is from an IP telephone, not a "DSS console," and without mention of the other limitations Defendants propose. Dkt. No. 126 at 22–24.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '699 Patent col.9 ll.20–26, col.9 ll.28–31.

Defendants respond: During prosecution, the applicant distinguished the prior art to overcome a rejection on the basis that the "selection of a direct station select input at an IP telephone" required an input from the DSS console. Dkt. No. 133 at 25.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: Dkt. No. 133-7 at 292–301, 298.[4]

---

[4] Defendants cite "Ex. G, 49" which is a page of July 22, 2002 Declaration and Power of Attorney for Patent Application. Defendants quote material that is found on page 7 of the March 16, 2005 Amendment.

Plaintiff replies: "DSS (direct station select) is not a piece of hardware. DSS is a technique for allowing a device to perform a function through a single action, such as pressing a key or button." The applicant explained during prosecution that "'direct station select input' is the input that allows access to an associated function." "It does not require (1) a DSS console, (2) LED lamps, or (3) any of the other restrictions that Defendants attempt to import into the claim language." Dkt. No. 135 at 5–6.

Plaintiff cites further **intrinsic evidence** to support its position: Dkt. No. 133-7 at 292–301, 298.

### <u>Analysis</u>

The issue in dispute is whether the "direct station select input" is necessarily an input from a DSS console, as that term is defined in the '699 Patent. It is.

The surrounding claim language provides some context informing the meaning of this term. Specifically, Claim 2 of the '699 Patent provides as follows:

> In an information handling system comprising a first LAN, a second LAN, and a WAN coupling the first LAN to the second LAN using a TCP/IP protocol, a method comprising the steps of:
> in response to selection of a voice mail access input and ***selection of a direct station select input at an IP telephone*** within the first LAN, sending a request from the first LAN to the second LAN over the WAN to establish a connection between the first LAN and the second LAN, wherein the direct station select input identifies a voice mail box within the second LAN;
> establishing an audio path over the connection between the voice mail box and the IP telephone; and
> playing a voice message stored in the voice mail box over a speaker in the IP telephone as a result of sending audio data containing the voice message over the audio path.

'699 Patent col.13 l.22 – col.14 l.4 (emphasis added). Thus, the "direct station select input" is something that is selected at an IP telephone.

This claim language was further explained by the applicant during prosecution of the '699

Patent. Specifically, the applicant explained as follows:

> Claim 17 recites a request to establish a connection between the LANs over the
> WAN is in response to selection of a voicemail access input and selection of a
> ***direct station select input*** at a telephone within the first LAN, wherein the
> direct station select input identifies a voicemail box within the second LAN.
> Contrary to the Examiners' assertions, this claim limitation is not taught or
> suggested within either of the prior art references. With respect to this specific
> claim recitation, the Examiner has asserted that the direct station select input is
> taught in *Pandharipande* at column 5, lines 40-66. More specifically, the
> Examiner asserts that the language within this recitation that describes how ANI
> information identifies the direct station for which a message will be delivered
> disclosed this claim limitation. This is not correct. ***A direct station select, or***
> ***DSS, is specifically described in the Specification*** on pages 16-17, and shown
> ***in Figure 8. A DSS*** console ***will have*** LED lamps and keys that can be
> ***programmed by the user to monitor the status of individual stations, trunks or***
> ***features. Pressing such a key will access the associated function. Thus,***
> ***Applicants have specifically identified in the Specification what a direct station***
> ***select input is, and the Examiner is not permitted to deviate from such an***
> ***interpretation***. *Id.* The language cited in *Pandharipande* by the Examiner does
> not disclose or suggest such a DSS input. Instead, *Pandharipande* describes a
> database query of database 34 using any information to determine if there are
> messages in a voicemail box. If there are messages available, then DTMF tones
> are transmitted. This is not the same as sending a request to establish a connection
> based on the selection of ***a DSS input at a telephone***, wherein the DSS input is
> associated and identifies a voicemail box within the other LAN.

Dkt. No. 133-7 at 298–99. Here, applicant "specifically identified" the description in the patent

that defines "direct station select input." The portion identified by applicant ("pages 16–17")

corresponds to the following the '699 Patent:

> ***A DSS console may be a stand-alone device, which connects to the IP telephony***
> ***device 105 to provide 64 individual LED lamps and keys***. The lamps can be
> programmed by the user to monitor the status of individual stations, trunks or
> features. Pressing the key will access the associated function. Each telephony
> device in the system can connect to a DSS console. The DSS console communicates
> with the IP telephony device 105 via a 9600 baud serial communication link. The
> IP telephony device 105 does not contain a serial UART device, so the serial data
> protocol is controlled by software running in DSP 801. Physical connection
> between the telephony device and DSS console may be via a standard two pair
> modular line cord.

'699 Patent col.9 ll.24–36 (emphasis added); Dkt. No. 133-7 at 18–19. This constitutes an unambiguous definition of the "direct station select input," which refers to a functional key on a DSS console. As the DSS console may be a stand-alone device connected to the IP telephone, this definition does not conflict with the claim language "at an IP telephone." Notably, a stand-alone console connected to an IP telephone can be "at an IP telephone." And the DSS console is not necessarily a stand-alone device, which indicates that that the DSS console and IP telephone may be the same device.

Accordingly, the Court construes this term as follows:

- "direct station select input" means "a key on a DSS console having LED lamps and keys that can be programmed by the user to monitor the status of individual stations, trunks or features."

**D.     U.S. Patent No. 8,391,298**

**D-1.   "a first local area network ('LAN')," "a second LAN," "a wide area network ('WAN')," and "a third LAN"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "a first local area network ('LAN')"<br><br>• '298 Patent Claim 1, 8 | Plain and ordinary meaning; no construction necessary. | the LANs and WAN are different |
| "a second LAN"<br><br>• '298 Patent Claim 1, 8 | | |
| "a wide area network ('WAN')"<br><br>• '298 Patent Claim 1, 8 | | |
| "a third LAN"<br><br>• '298 Patent Claim 1, 8 | | |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**<u>The Parties' Positions</u>**

Plaintiff submits: There is no support for injecting a "different" limitation into the construction. In fact, it is not clear what it means for the networks to be "different." Dkt. No. 126 at 24.

Defendants respond: In the context of the claims and the described embodiments, "not only are the first and second LANs different components to the overall network topology, but they are different components with an intervening component separate and apart from the LANs, a WAN." Dkt. No. 133 at 25–27.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '298 Patent Figure 1, Figure 3, col.2 ll.46–62, col.3 ll.18–30, col.3 l.50, col.10 l.59, col.14 l.18.

**<u>Analysis</u>**

The issue in dispute appears to be whether the first, second, and third LANs and the WAN that are separately recited in the claims are distinct components. They are. This is the plain import of separately reciting elements in a claim and Plaintiff has not established another meaning such that would allow, for example, that the first and second LANs to be the same singular LAN. *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention." (quotation and modification marks omitted)). This does not mean, however, that two LANs or a LAN and a WAN cannot be of the same type of network.

Accordingly, the Court address the dispute over these terms with the following construction:

- "a first local area network ('LAN')," "a second LAN," "a wide area network ('WAN')," and "a third LAN" as recited in the claims means "the first LAN, second LAN, third LAN, and WAN are networks that are distinct from each other."

### D-2. "wherein the list of the plurality of telecommunications extensions is stored in a server in the second LAN, and is accessed by the first circuitry across the WAN"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "wherein the list of the plurality of telecommunications extensions is stored in a server in the second LAN, and is accessed by the first circuitry across the WAN"<br><br>• '298 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | the alpha-numeric depiction of all telephone extensions for all telephones located on the second LAN is stored in memory located on the second LAN |

**The Parties' Positions**

Plaintiff submits: The meaning of this term is plain without construction and is not as Defendants propose. For example, a list of telecommunication extensions is not coextensive with an alpha-numeric depiction of telephone extensions. Nor does a list that contains a plurality of extensions necessarily contain "all" extensions. Nor is storing a list in a server coextensive with storing a list in memory. Dkt. No. 126 at 25–26.

Defendants respond: "The '298 Patent [] discloses that the extension numbers for a particular LAN are stored in the hard disk drive 403 of the server for that LAN; this intrinsic record disclosure is consistent with both the claim language and the only described support for this element." During prosecution of the patent, the applicant reiterated that the "list … stored in a server in the second LAN" must be "found within the second LAN, not outside the second LAN." Finally, "the only

written description support for the claimed 'list of the plurality of telecommunications extensions'"
is a "list of names and phone numbers." Dkt. No. 133 at 27–29.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to
support their position: '298 Patent col.2 ll.46–62, col.3 ll.62–65, col.11 l.38, col.13 ll.44–46; Dkt.
No. 133-8 at 139–153, 151; Dkt. No. 133-8 at 174–91, 185[5]; Dkt. No. 133-8 at 220–49, 231.

**Analysis**

The dispute appears to distill to four issues: First, whether the list is necessarily stored in the
second LAN. It is, but it is expressly stored in a server in the second LAN rather than just
"memory" in the second LAN. Second, whether the list necessarily includes all
telecommunications devices in the second LAN. It does not. Third, whether the list necessarily is
an "alpha-numeric depiction." It is not. Fourth, whether "telecommunication extensions" are
necessarily "telephone extensions." They are not.

The list must be in the second LAN, but not simply in memory in the second LAN. The
meaning of "the list … stored in a server in the second LAN" is plain without construction.
Notably, "stored in a server" is not coextensive with "stored in memory." For example, it is not
clear that all memory is necessarily in a server. And it is not clear if Defendants intend "memory"
to encompass anything that can store computer information or to have a more limited meaning.
Ultimately, Defendants have not established that it is accurate or helpful to construe "stored in a
server" as "stored in memory."

The list expressly includes "the plurality of telecommunications extensions," but does not
require "all" the extensions in the second LAN. Claim 1 of the '298 Patent is an open-ended
"comprising" claim and recites "a plurality of telecommunications extensions coupled to the

---

[5] The relevant portion of the January 22, 2008 Amendment appears twice in Defendants' Ex. H, first at page 185 and
second at page 189 of Dkt. No. 133-8.

second LAN." '298 Patent col.15 l.58, col.15 ll.66–67. It thus allows that there may be more extensions in the second LAN than the "plurality" of extensions. The list that includes "the plurality" then does not necessarily include extensions that are not part of the plurality.

The list is not necessarily an "alpha-numeric depiction." Nothing identified by Defendants rises to the exacting standard to justify such a limitation. Indeed, the only support for this that Defendants offer is directed to an exemplary display of a list rather than an inherent attribute of storage of a list:

> The display response message 1112 will show the first entry in the station or system rolodex list selected by the user for that remote site (e.g., Detroit 302). ***For example***, if the station rolodex list is shown for the remote site (e.g., Detroit 302), then the first name in that list and the associated telephone number will be ***displayed on the display*** 810 of IP telephone 105.

'298 Patent col.11 ll.34–40 (emphasis added).

Finally, Defendants have presented no sufficient reason to rewrite "telecommunications extension" as "telephone extension."

Accordingly, the Court rejects Defendants' proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

**D-3.** **"select between observing the list of the plurality of telecommunications extensions coupled to the second LAN or observing a list of the plurality of telecommunications extensions coupled to the third LAN"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "select between observing the list of the plurality of telecommunications extensions coupled to the second LAN or observing a list of the plurality of telecommunications extensions coupled to the third LAN"<br><br>• '298 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | determine which of two [lists of the plurality of telecommunications extensions] is displayed to the user |

**The Parties' Positions**

Plaintiff submits: The meaning of this term is plain without construction and is not as Defendants suggest. For example, "select" and "determine" are not coextensive. Further, the claim does not require displaying a list, which is separately recited in a dependent claim. Dkt. No. 126 at 26–27.

Defendants respond: This term is directed to switching between displayed lists. "By first providing a first list, and then, in response to a user input, displaying a second list, the '298 Patent provides for a way to cycle observable lists." There is no way "to observe a list without causing the list to be displayed." Dkt. No. 133 at 29–30.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '298 Patent col.11 ll.2–47, col.13 ll.44–46; Dkt. No. 133-8 at 220–49, 246–48.

40

**Analysis**

The issue in dispute appears to be whether this terms necessarily entails display of a list. It does not.

When interpreted in light of surrounding claim language, this term refers to selecting a list for observation but does not require actually displaying the selected list. Specifically, Claims 1–3, and 6 of the '298 Patent recite:

> **1.** An information handling system comprising:
> a first local area network ("LAN");
> a second LAN;
> a wide area network ("WAN") coupling the first LAN to the second LAN;
> a third LAN coupled to the first and second LANs via the WAN;
> a first telecommunications device coupled to the first LAN;
> a plurality of telecommunications extensions coupled to the second LAN;
> the first LAN including ***first circuitry for*** <u>***enabling***</u> ***a user of the first telecommunications device*** <u>***to observe***</u> ***a list of the plurality of telecommunications extensions***;
> the first LAN including second circuitry for automatically calling one of the plurality of telecommunications extensions in response to the user selecting one of the plurality of telecommunications extensions from ***the*** <u>***observed list***</u>, wherein the list of the plurality of telecommunications extensions is stored in a server in the second LAN, and is accessed by the first circuitry across the WAN; and
> a plurality of telecommunications extensions coupled to the third LAN, the first LAN including circuitry for enabling the user to ***select between*** <u>***observing the list***</u> of the plurality of telecommunications extensions coupled to the second LAN ***or*** <u>***observing a list***</u> of the plurality of telecommunications extensions coupled to the third LAN.
>
> **2**. The system as recited in claim 1, wherein communication among the first LAN, second LAN, and WAN uses an IP protocol.
>
> **3**. The system as recited in claim 2, wherein ***the list of the plurality of telecommunications extensions*** <u>***is displayed***</u> to the user of the first telecommunications device.
>
> **6**. The system as recited in claim 1, wherein ***the list of the plurality of telecommunications extensions*** <u>***is played as audio***</u> to the user of the first telecommunications device.

'298 Patent col.15 l.58 – col.16 l.25, col.16 ll.39–42 (emphasis added). In this context, the system of Claim 1 includes structure for enabling observation of a list, and selection of the list to be observed, but does not specify actual display of the list. Claim 3, which ultimately depends from Claim 1, expresses a system that displays the list, indicating that a user may observe a list by looking at it. *See also id.* at col.9 ll.64–67 ("Naturally, using a workstation 106, such a listing of names and phone numbers can be viewed on the display screen. Additionally, using display 810 on the IP telephone 105, the same process can be accomplished."). Claim 6, which depends from Claim 1, expresses a system that plays an audio version of the list, indicating that a user may observe a list by listening to it. *See also id.* at col.9 l.67 – col.10 l.4 ("Alternatively, the names and phone numbers could be vocally listed over the speaker 821 on the IP telephone 105 as opposed to displaying the names and phone numbers on the IP telephone display 810.").

Accordingly, the Court construes this term as follows:

- "select between observing the list of the plurality of telecommunications extensions coupled to the second LAN or observing a list of the plurality of telecommunications extensions coupled to the third LAN" means "select which of two [lists of the plurality of telecommunications extensions] is to be audibly or visibly displayed to the user."

**D-4.    "circuitry for automatically calling …"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "second circuitry for automatically calling one of the plurality of telecommunications extensions in response to the user selecting one of the plurality of telecommunications extensions from the observed list"<br><br>• '298 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | This is a 112 ¶ 6 claim element.<br><br>function:<br>• automatically calling one of the plurality of telecommunications extensions in response to the user selecting one of the plurality of telecommunications extensions from the observed list<br><br>structure:<br>• DSP structure disclosed at 4:26-56, 5:33-38, 6:9-23, 8:66- 9:24 and equivalents thereof, including then existing Texas Instrument 5410 DSPs |
| "second circuitry for automatically calling the second telephone extension in response to the user selecting the second telephone extension from the viewed list"<br><br>• '298 Patent Claim 9 | Plain and ordinary meaning; no construction necessary. | This is a 112 ¶ 6 claim element.<br><br>function:<br>• automatically calling the second telephone extension in response to the user selecting the second telephone extension from the viewed list<br><br>structure:<br>• DSP structure disclosed at 4:26-56, 5:33-38, 6:9-23, 8:66- 9:24 and equivalents thereof, including then existing Texas Instrument 5410 DSPs |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: These terms are not governed by 35 U.S.C. § 112, ¶ 6. The claim-recited "circuitry" in combination with the claim-recited description of its operation is sufficiently structural to maintain the presumption against § 112, ¶ 6. Further, if the term is analyzed under § 112, ¶ 6, Defendants' proposed structure improperly includes a number of structural features not necessary to the claim-recited functions. Dkt. No. 126 at 28–32.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '298 Patent col.4 ll.26–56.

Defendants respond: The circuitry of these terms are defined by what they do rather than what they are. Neither the adjectival qualifications nor the description of the operation of the claimed circuitry provide any definite structure. As such, these terms are subject to § 112, ¶ 6. Dkt. No. 133 at 30–33.

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '298 Patent col.4 ll.26–56, col.5 ll.33–38, col.6 ll.9–23, col.8 l.66 – col.9 l.24. **Extrinsic evidence**: Dkt. No. 133-11.[6]

**Analysis**

There are two issues in dispute. First, whether the "circuitry" terms are governed by 35 U.S.C. § 112, ¶ 6. Second, if the terms are governed by the statute, whether the Defendants' have identified the appropriate structure. The Court determines that these terms are not governed by § 112, ¶ 6 and therefore does not address the second issue.

---

[6] Declaration of Dr. Shukri Souri in Support of Defendants' Opening Claim Construction Brief (Dec. 11, 2020).

Defendants have not overcome the presumption against applying § 112, ¶ 6. The Court begins with the presumption that § 112, ¶ 6 does not apply because the terms do not include the "means" language traditionally used to signal application of the statute. *Williamson*, 792 F.3d at 1347–49 & n.3. This "presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1349 (quotations omitted). "[T]he mere fact that the disputed limitations incorporate functional language does not automatically convert the words into means for performing such functions." *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018). "The question whether [a term] invokes section 112, paragraph 6, depends on whether persons skilled in the art would understand the claim language to refer to structure, assessed in light of the presumption that flows from the drafter's choice not to employ the word 'means.'" *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1354 (Fed. Cir. 2020).

The circuitry language does not invoke § 112, ¶ 6. Two Federal Circuits opinion are instructive on this issue. In *Personalized Media*, the Federal Circuit reversed the International Trade Commission's holding that the term "digital detector for [performing a function]" was governed by § 112, ¶ 6 and that the claim was indefinite for lack of structure. *Personalized Media Communs., L.L.C. v. ITC*, 161 F.3d 696, 700–01, 703–707 (Fed. Cir. 1998). The Federal Circuit held that "'detector' had a well-known meaning to those of skill in the electrical arts connotative of structure." *Personalized Media Communs., L.L.C.*, 161 F.3d 696 at 704–05 & n.12 (citing dictionary definitions of detector). The Federal Circuit went on to explain that,

> neither the fact that a 'detector' is defined in terms of its function, nor the fact that the term 'detector' does not connote a precise physical structure in the minds of those of skill in the art detracts from the definiteness of structure. . . . Even though the term 'detector' does not specifically evoke a particular structure, it does convey

45

> to one knowledgeable in the art a variety of structures known as 'detectors.' We therefore conclude that the term 'detector' is a sufficiently definite structural term to preclude the application of § 112, P 6.

*Id*. Similarly, in *Linear Technology*, the Federal Circuit reversed a district court's holding that "circuit for [performing a function]" terms were governed by § 112, ¶ 6. *Linear Tech. Corp. v. Impala Linear Corp*., 379 F.3d 1311, 1319–21 (Fed. Cir. 2004). The court determined that:

> Technical dictionaries, which are evidence of the understandings of persons of skill in the technical arts, plainly indicate that the term 'circuit' connotes structure. . . . For example, *The Dictionary of Computing* 75 (4th ed. 1996) defines "circuit" as "the combination of a number of electrical devices and conductors that, when interconnected to form a conducting path, fulfill some desired function." . . . Thus, when the structure-connoting term "circuit" is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 P 6 presumptively will not apply.

*Linear Tech. Corp.*, 379 F.3d 1311 at 1320. Because the claims themselves included the "objectives or operations" of the circuit and because "persons of ordinary skill in the art would understand the structural arrangements of circuit components from the term 'circuit' coupled with the qualifying language of [the] claim[s]," the court held that § 112, ¶ 6 did not apply. *Id*. at 1320–21.

Like the claim-recited "detector" in *Personalized Media* and the claim-recited "circuit" in *Linear Technology*, the "circuitry" terms here provide sufficiently definite structure to maintain the presumption against § 112, ¶ 6. Notably, the term "circuitry" itself connotes a broad class of structures. *See Linear Tech.,* 379 F.3d at 1320. And the claims provide significant structural context through recitation of the objectives and operation of the circuitry within the claims. Under Federal Circuit precedent, such claim recitation of how functionally defined components interact to achieve a claim-recited objective provides sufficient indicia of structure to maintain the presumption against § 112, ¶ 6. *See, e.g., id.* at 1319–21; *Apple Inc.*, 757 F.3d at 1295, 1301 ("heuristic [for performing a function]" found to be sufficiently definite structure in part because

the claim described the operation and objectives of the heuristic); *Zeroclick, LLC*, 891 F.3d 1008

("program that can [perform function]" found to be sufficiently definite structure in part because

the claims provided operational context for the program); *Prisua Eng'g Corp.*, 948 F.3d at 1347–

48, 1353–54 ("digital processing unit … performing [functions]" found to be sufficiently definite

structure in part because the claims provided operational context for the unit). Given this context,

Defendant has failed to overcome the presumption against applying § 112, ¶ 6.

Accordingly, the Court rejects Defendants' proposed constructions and determines that these

terms have their plain and ordinary meanings without the need for further construction.

## V.    CONCLUSION

The Court adopts the constructions above for the disputed and agreed terms of the Asserted

Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed

in this Order is constrained by the Court's reasoning. However, in the presence of the jury the

parties should not expressly or implicitly refer to each other's claim construction positions and

should not expressly refer to any portion of this Order that is not an actual construction adopted

by the Court. The references to the claim construction process should be limited to informing the

jury of the constructions adopted by the Court.

**SIGNED this 21st day of March, 2021.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE